UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LUDYS NUNEZ,

                              Plaintiff,                           11 Civ. 8711 (PKC)

           - v.-

                                                                  MEMORANDUM
                                                                  AND ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge.

            Plaintiff Ludys Nunez, proceeding pro se, seeks judicial review of a final decision

by the Commissioner of Social Security (the "Commissioner") denying her application for a

Period of Disability, Disability Insurance Benefits and Supplemental Security Income ("SSI")

under Title II, 42 U.S.C. § 401 et seq, and/or Title XVI of the Social Security Act ("the Act"), 42

U.S.C. § 1381 et seq.  Plaintiff asserts that the decision of the Administrative Law Judge ("ALJ")

"was erroneous, not supported by substantial evidence on the record, and/or contrary to the law."

(Complaint ¶ 9.)  Defendant moves for judgment on the pleadings pursuant to Rule 12(c), Fed.

R. Civ. P., and urges that the decision of the Commissioner be affirmed. (Answer ¶ 13)  For the

reasons explained below, the defendant's motion is granted.


I.   PROCEDURAL HISTORY

            On September 11, 2008, plaintiff applied to the Social Security Administration

("SSA") for Disability Insurance Benefits and SSI, alleging that she was disabled as of May 30,

1

2008, due to mental illness and depression. (R. 11, 40, 1, 58–72, 93.)[1]  On December 1, 2008,

plaintiff's application was denied upon initial review by the SSA, finding that plaintiff's

conditions were not severe enough to prevent her from working. (R. 42–47.)  On January 28,

2009, plaintiff requested a hearing before an ALJ, which was held on May 10, 2010. (R. 11, 21–

39, 48–50.)  Plaintiff appeared pro se before ALJ Kenneth G. Levin. (Id.)

> The ALJ considered the case de novo and denied plaintiff's claims for benefits.

(R. 11–18.)  After applying the five-step sequential test for determining whether an individual is

disabled, the ALJ found that plaintiff is not disabled under sections 216(i), 233(d), or

1614(a)(3)(A) of the Act. (R. 18)  At the first step, the ALJ concluded that plaintiff had engaged

in substantial gainful activity since May 30, 2008, her alleged onset date. (R. 14, 16–17.)  At the

second step, the ALJ concluded that plaintiff does have a "severe" combination of major

depressive disorder (mild to moderate in degree) and anxiety disorder, not otherwise specified

("NOS"). (R. 18.)  The ALJ next determined at step three that plaintiff's mental impairments did

not meet or medically equal the requisite criteria contained in the Listings. (R. 17–18.)

Thereafter, the ALJ assessed that plaintiff retained the residual functional capacity to perform a

full range of work at all exertional levels that was simple, repetitive and low stress; and which

only required one-or-two step commands, and which involved only limited amounts of social

contact. (Id.)  At the fourth step, the ALJ compared plaintiff's residual functional capacity to her

past relevant work doing childcare, selling ice cream and washing hair, but determined that she

was unable to perform this work. (Id.)  The ALJ proceeded to step five, and relying on vocational

---

[1] Citations to "(R. __)" refer to the certified copy of the administrative record of proceedings filed by the Commissioner as part of his answer.

expert testimony, found that there were other jobs that plaintiff could perform given her age, education, work experience and residual functional capacity. (Id.)

The ALJ issued his decision on June 11, 2010, finding that plaintiff has not been disabled since May 30, 2008. (R. 11–18.)  On September 17, 2011, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (R. 1–3.)

On November 28, 2011, plaintiff, proceeding pro se, filed a timely action with this Court seeking review of the Commissioner's final decision. (Compl. ¶ 1); 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c); 20 C.F.R. § 422.210(c).

## II. EVIDENCE BEFORE THE ALJ

At the hearing before the ALJ, plaintiff testified about her age, education, background, family, work history, daily activities and physical and psychiatric condition. (R. 23–33)  The ALJ also reviewed documentary evidence including plaintiff's extensive medical and psychiatric records from various physicians and psychologists.  In addition to the documentary evidence, the ALJ heard testimony from both medical and vocational experts regarding plaintiff's mental health and vocational alternatives, respectively. (R. 33–39.)

### A. Non-Medical Evidence

Plaintiff was born in the Dominican Republic on May 15, 1973, and moved to the United States at age 13. (R. 28, 88.)  When she applied for benefits she was 35, and she was nearly 37 at the time of the hearing before the ALJ. (Id.)  Plaintiff testified that she completed two years of college and obtained an Associate's Degree in Business Administration. (R. 37, 98.) Plaintiff further testified that she can read, write and converse in English, but states that she is not fluent and does not speak the language well. (R. 37.)

3

At the time of her hearing, plaintiff lived in an apartment in the Bronx with her four children (ages 15, 11, 7 and 2) and her aunt. (R. 29.) Plaintiff testified that her husband had recently stopped living with her after he had hit her. (Id.) Plaintiff testified that during an ordinary day, when her children were home, she would stay home and clean the house, sometimes go shopping with her aunt, but would not watch television or read. (R. 30.) However, at the time she applied for benefits, plaintiff stated that she watched television for seven hours a week and shopped for groceries everyday for 25 to 30 minutes. (R. 108.) She had taken her daughter to the movies two weeks prior to the hearing for the first time "after a long time." (R. 30.) She stated that when she does go to the movies, she goes early so as to avoid people. (Id.) Plaintiff had one friend with whom she would talk on the phone when she felt depressed, and saw this friend once every three months or on special occasions. (R. 30–31.)

Plaintiff testified that she has worked since May 30, 2008, her alleged onset date. (R. 25.) As part of her application for benefits, she reported that she worked from 2004 through May 2008, as an ice cream vendor. (R. 94; see R. 116.) At the time of her application, she stated that she had performed this work five days a week, eight hours a day, and earned $14,000.00 per year. (R. 94, 116.) She also stated that her responsibilities included buying merchandise from a wholesaler, loading merchandise onto the truck, driving the truck and selling ice cream. (Id.) However, at the hearing before the ALJ, plaintiff testified that she merely assisted her husband in serving the ice cream, and performed this work from 3:00 to 4:30 p.m. each day. (R. 26.)

Plaintiff also worked as a babysitter from 2008 through 2010. (R. 25.) She testified that she was caring for two children in her home – one a pre-school child who was with her "since the morning" until about 4 p.m., and the other a school-age child she watched from the end of the school day until her mother came to pick her up at about 4:30 or 5 p.m. (Id.; see R.

4

117.) At the time she applied for benefits, plaintiff stated that she would cook for the children and take them to the park. (R. 117.) However, at the hearing she testified that while she gave the children food, her husband actually did most of the childcare work, including taking the children to the park. (R. 26.) Plaintiff said that the earnings were posted to her earnings record because her husband was in the country illegally and thus did not have a social security number. (R. 25.) She stated that once she separated from her husband, she no longer did the childcare work. (R. 30.)

Plaintiff testified that she feels unable to work because she is constantly depressed. (R. 26–27.) She said that she cannot be around other people and is nearly incapable of going out of her home alone. (R. 27–28.) She attributed her condition to her experience being stuck on the subway with her daughter, and then being separated from her daughter, during the September 11, 2001 attack. (R. 27.) Plaintiff testified that she has been unable to ride subways since that time. (Id.) She also fears that she will be attacked if she is out on the street. (R. 28.)

     B. *Medical Evidence*

     1. *Medical Evidence Submitted Prior To ALJ's Decision*

Plaintiff was not receiving any mental health treatment at the time she filed her application, but stated that she had been evaluated at Bellevue Hospital on October 20, 2008, where she was planning to start treatment. (R. 144.) On November 5, 2008, Haruyo Fujiwaki, Ph.D, conducted a consultative "psychiatric" evaluation, at plaintiff's request, for this claim. (R. 144–46.) Plaintiff reported to Dr. Fujiwaki that she traveled for 30 minutes by train to attend the evaluation, and that she last worked in October 2008 as a babysitter and was fired because she did not feel safe taking the children to the park. (R. 144.)

5

Plaintiff reported symptoms consistent with depression and anxiety, and reported a past history of substance abuse and of an abusive childhood. (Id.)  Dr. Fujikawi reported that plaintiff was cooperative and responsive to questions, and that her manner of relating, social skills and overall presentation were fair. (R. 145.)  Plaintiff was casually dressed, adequately groomed and her gait, posture and motor behavior were normal. (Id.)  Her eye contact was appropriately focused. (Id.)  Plaintiff's speech intelligibility and language skills were adequate, and her thought processes were coherent and goal-directed with no evidence of hallucinations, delusions or paranoia. (Id.)  Plaintiff had an anxious affect, a neutral mood and a clear sensorium. (Id.)  She was oriented to person, place and time. (Id.)  Dr. Fujiwaki reported that plaintiff's attention and concentration were mildly impaired due to her anxiousness and nervousness in the evaluation. (R. 146.)  Plaintiff's recent and remote memory were mildly impaired, possibly due to anxiety or nervousness in the evaluation. (Id.)  The doctor found that the plaintiff's intellectual functioning appeared to be below average, and her general fund of information was somewhat limited. (Id.)  Plaintiff's insight was fair and her judgment was poor. (Id.)

Dr. Fujiwaki opined that, vocationally, plaintiff was able to follow and understand simple directions and instructions. (Id.)  She could perform simple tasks independently and make some simple decisions. (Id.)  While plaintiff had some difficulty maintaining attention and concentration, she was able to maintain a regular schedule. (Id.)  She could learn new tasks with extended time and rest breaks, and could perform complex tasks with supervision and some difficulty. (Id.)  She might have difficulty relating with others and dealing with stress appropriately. (Id.)

6

Based on these observations, Dr. Fujiwaki found that "the results of the examination appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with the [plaintiff's] ability to function on a daily basis." (R. 146–47.) He diagnosed the plaintiff with depressive disorder, NOS; anxiety disorder, NOS, alcohol dependence; cocaine dependence, in remission; and cannabis dependence, in remission. (R. 147.)

Peter Kudler, M.D., a state agency psychologist, reviewed the medical evidence and completed a psychiatric review technique form on November 17, 2008. (See R. 148–61.) Dr. Kudler assessed plaintiff's mental impairments under Listings 12.04 (Affective Disorder), 12.06 (Anxiety-Related Disorders), and 12.09 (Substance Addiction Disorders). (R. 148, 151, 153, 156.) Dr. Kudler concluded that plaintiff had only "mild" deficits in her activities of daily living, her social functioning and her concentration, persistence or pace, and that she was capable of at least some work activity. (R. 158.)

Dr. Kudler also assessed plaintiff's mental residual functional capacity. (R. 162–65.) He concluded that plaintiff had no significant limitations in any sub-category of understanding and memory. (R. 162.) He further concluded that plaintiff's functional abilities were "not significant[]" or were "moderate[]" in sub-categories of sustained concentration and persistence, and adaptation. (R. 162–63.) Plaintiff was found to have moderate limitations in all sub-categories of social interaction. (R. 163.) Dr. Kudler opined that plaintiff had some difficulty maintaining attention and concentration, but was able to: follow and understand simple directions and instructions; form simple tasks independently; maintain a regular schedule; and learn new tasks with extended time and rest breaks. (R. 164.) He concluded that plaintiff could perform complex tasks with supervision and some difficulty, and that she could make some

7

simple decisions, but might have difficulty relating with others and dealing with stress appropriately. (Id.)

On eight occasions, between June 11, 2009 and February 8, 2010, plaintiff received treatment from Elishka Caneva, M.D., at the Westchester Avenue Center ("WAC"). (R. 168–218.)  Plaintiff also received bi-weekly therapy from a social worker at WAC, who concluded that in October 2009 and January 2010 that plaintiff's Global Assessment of Functioning ("GAF") was 60.[2] (R. 171, 175–77, 179–89, 191–200, 202–06, 208–10, 214–16.)

At Dr. Caneva's first psychiatric evaluation on June 11, 2009, plaintiff reported a long history of depression and anxiety, and was taking 20 milligrams of Lexapro every day with good effect. (R. 168.)  She denied depressed mood, suicidal or homicidal ideation, sleep or appetite disturbance, hallucinations, paranoia or suspiciousness, and psychotic symptoms. (R. 168–69.)  Dr. Caneva diagnosed plaintiff with major depressive disorder (recurrent, moderate). (Id.)  Plaintiff was continued on her then current dosage of Lexapro. (Id.)

Plaintiff returned to Dr. Caneva on August 1, 2009. (R. 170.)  Plaintiff reported that she had complied with medications and had no side effects. (Id.)  Plaintiff was feeling depressed, sad, anxious, fatigued and had low motivation. (Id.)  Dr. Caneva raised the Lexapro dose to 30 mg and added 10 mg of Ambien for sleep. (Id.)  On August 24, plaintiff continued to complain of symptoms, and the Lexapro was changed to Wellbutrin, 100 mgs. (R. 172–73.)  At the next visit, on September 14, plaintiff reported less severe symptoms, but her Wellbutrin dose was increased to 150 mgs in order to "maximize [the] benefit." (173–74.)  At her next visit,

---

[2] GAF is a rating of overall psychological functioning on a scale of 0 to 100. See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed. text revision 2000). A GAF of 51-60 denotes moderate symptoms or moderate difficulty in social, occupational, or school functioning. Id.

plaintiff complained of intense anxiety, and Klonopin, 0.5 mgs, was added to her regimen. (R. 178.)

While plaintiff reported that her mood was depressed or anxious at times, and Dr. Caneva noted that plaintiff's affect was sometimes sad or constricted, subsequent mental status examinations yielded no additional findings. (See R. 172, 174, 178, 190, 207, 217.)  At her November 9 appointment with Dr. Caneva, plaintiff reported improved symptoms. (R. 190.)  On January 9, plaintiff's mood was reportedly "good" and her affect was euthymic, constricted, stable, and appropriate. (R. 207.)  However, she was somewhat worse at her next (and final documented) visit on February 8, because of marital discord. (R. 217.)  Her mood was recorded as "OK," and her affect was once again euthymic, constricted, stable, and appropriate. (R. 217–18.)

### 2.  *Medical Expert Testimony*

Dr. Vitolo reviewed the medical evidence, heard plaintiff's testimony, and testified as a medical expert for the defense at her hearing on May 10, 2010.[3] (See R. 34–36.)  Dr. Vitolo testified that plaintiff's medically determinable impairments were major depressive disorder, anxiety disorder, NOS, and substance abuse disorder. (R. 34.)  The doctor opined that under the "Paragraph B" criteria of the mental impairment Listings, plaintiff had moderate impairments in activities of daily living, social functioning, and in concentration, persistence, or pace. (Id.)  Dr. Vitolo further opined that these conditions have caused "one or two" episodes of deterioration or decompensation. (Id.)  The doctor noted that plaintiff appeared to be responding to treatment and adjustments in medication. (Id.)  The conditions, in his opinion, still leave

---

[3] The record does not appear to contain any other information with regard to Dr. Vitolo's name or medical specialization.

plaintiff with the residual functional capacity to perform substantial gainful employment so long
as it is simple and repetitive, is low in stress, requires only one or two step commands, and
involves just limited amounts of social contact. (Id.)

### 3.  *Medical Evidence Submitted After ALJ's Decision*

The plaintiff submitted additional medical evidence consisting of laboratory blood
test results, an electrocardiogram report ("EKG"), a copy of the F.E.G.S. summary report, and
two "Treating Physician Wellness Plan Reports."[4] (See R. 220–35.) The EKG report showed
nonspecific ST and T wave abnormality. (R. 224.) Dr. Caneva completed the two Wellness
Reports on August 23 and September 29, 2010. (See R. 232–36.) The doctor reported that
plaintiff's relevant clinical findings were depressed mood, anxiety, insomnia and change in
energy. (R. 232, 235.) Also, the doctor indicated that plaintiff was "temporarily unemployable."
(R. 232–35.)

### 4.  *Vocational Expert Testimony*

The ALJ heard the testimony of Ms. Vascardy, a vocational expert. (R. 36–38.)
The ALJ asked the vocational expert to consider a hypothetical person of plaintiff's age,
education, language ability and prior work that involved one or two step tasks and limited social
contact. (R. 37.) Ms. Vascardy testified that such a person could perform work as a hand
packager, cleaner, small products assembler, and packer at the light level. (R. 38.) A hand
packager is an unskilled job, performed at the medium exertional level, with 10,318 such jobs in
the local economy, and 162,882 in the national economy. (Id.) A cleaner is also unskilled work

---

[4] F.E.G.S. Health and Human Service System is a health and human services agency of the U.J.A. Federation of
New York whose mission is to provide a "diverse network of high quality, cost-efficient health and human services
that help each person achieve greater independence at work, at home, at school and in the community, and meet the
ever-changing needs of business and our society." F.E.G.S. Health and Human Services System,
http://www.fegs.org/about/about_fegs (last visited July 2, 2013).

performed at the medium exertional level, with 79,178 such jobs in the local economy and 1,058,165 in the national economy. (Id.)  A small products assembler and light packer are both unskilled, light work. (Id.)  There were 2,073 small products assembler jobs in the local economy and 40,662 in the national economy. (Id.)  Furthermore, there were 19,948 light packer jobs locally and 314,905 nationally. (Id.)

III. APPLICABLE LAW

   A. *Standard of Review*

   Under Rule 12(c), Fed. R. Civ. P., a movant is entitled to judgment on the pleadings only if the movant establishes "that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." Juster Assocs. v. City of Rutland, Vt., 901 F.2d 266, 269 (2d Cir. 1990) (citations omitted).  Judgment on the pleadings is appropriate where no material facts are in dispute, and "where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988) (citation omitted).

   Review of the Commissioner's final decision denying disability benefits is limited.  The court may not review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998)).  If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision. 42 U.S.C. § 405(g) ("The findings of the Commissioner, . . . if supported by substantial evidence, shall be conclusive, and where a claim has been denied . . . the court shall review only the question of conformity with [the] regulations . . . ."); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing Bubnis v. Apfel, 167 F.3d 177, 181 (2d Cir. 1998)).  Therefore, the court's review involves two levels of inquiry. Tejada v.

11

Apfel, 167 F.3d 770, 773 (2d Cir. 1999). First, the court must review "whether the Commissioner applied the correct legal standard." Id.; see Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence. Tejada, 167 F.3d at 773.

The ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (quoting Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)). The ALJ's factual findings supported by substantial evidence are "binding" on this court; however, "where an error of law has been made that might have affected the disposition of the case," this court cannot simply defer to the ALJ's factual findings. Id. Legal error may include failure to adhere to the applicable regulations. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (citing Schaal, 134 F.3d at 504–05).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Halloran v. Barnhart, 362 F.3d at 31. Relevant evidence includes more than just findings on basic evidentiary facts, it also includes inferences and conclusions drawn from such facts. Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1968); Rivas v. Barnhart, 2005 WL 183139, at *18 (S.D.N.Y. Jan. 27, 2005) (citations omitted). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). When reviewing the evidence supporting the Commissioner's decision to determine whether it is substantial, the court should review the record as a whole, and "not look at that evidence in isolation[,] but rather [ ] view it in light of other evidence that

12

detracts from it." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir.1990) (citation omitted). However, even if there is substantial evidence contrary to the Commissioner's position, the Commissioner's determination will not be disturbed. See DeChirico v. Callahan, 134 F.3d 1177, 1182 (2d Cir.1998) (upholding the Commissioner's decision where there was substantial evidence for both sides).

When reviewing the factual record, it is not the role of this court "to resolve evidentiary conflicts . . . [or] to appraise the credibility of witnesses, including claimant;" instead, those are the judgments for the Commissioner. Carroll v. Sec'y of Health and Human Services, 705 F.2d 638, 642 (2d Cir.1983) (citations omitted).  Accordingly, genuine conflicts in the medical evidence are for the Commissioner to resolve. Veino, 312 F.3d at 588 (citations omitted).  Courts give deference to an ALJ's credibility determination because the ALJ had the opportunity to observe plaintiff's demeanor while testifying. Ruiz v. Barnhart, 2006 WL 1273832, at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n. 6 (S.D.N.Y. Apr. 24, 1995).

Before deciding if the Commissioner's determination is supported by substantial evidence, courts must first be satisfied that the claimant received "a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir. 1972)).  The ALJ has an affirmative duty to fully and fairly develop an administrative record. Echevarria, 685 F.2d at 755. This duty arises from the essentially non-adversarial nature of a benefits proceeding where the Secretary is not represented. Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's

13

medical history 'even when the claimant is represented by counsel . . . .'" Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). To this end, "the reviewing court must make a 'searching investigation' of the record to ensure that" the ALJ protected the claimant's rights. Robinson v. Sec'y of Health and Human Servs., 733 F.2d 255, 258 (2d Cir. 1984) (citation omitted).

     B. *Five-Step Disability Determination*

     The Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act provides that "an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of significant gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); Rosa, 168 F.3d at 77. The Commissioner's determination of a claimant's disability follows a five-step sequential analysis promulgated by the Act. See 20 C.F.R. § 404.1520. The Second Circuit has described this procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, [second,] the [Commissioner] considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work

14

experience . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. [Fifth], if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa, 168 F.3d at 77 (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)).

The claimant bears the burden of proof for the first four steps. Shaw, 221 F.3d at 132. If the claimant meets her burden on the first four steps, the burden shifts to the Commissioner at the fifth step to "show there is other gainful work in the national economy which the claimant could perform." Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002) (quoting Carroll, 705 F.2d at 642). Work that exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2) (A).

At the fifth step, the Commissioner considers the claimant's residual functional capacity and vocational factors, such as age, education, and work experience in conjunction with the Medical–Vocational Guidelines (the "Grid") to determine whether claimant can successfully adjust to other work. 20 C.F.R. § 416.920; see 20 C.F.R. Part 404, Subpart P, Appendix 2. Reliance on the applicable Grid satisfies the Commissioner's burden if a claimant "suffers only from exertional impairments." Rosa, 168 F.3d at 82. Exertional impairments are those that "affect only your ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b). If a claimant's characteristics match the requirements for a particular Grid, the rule directs a conclusion as to whether he is disabled. Id. (quoting Pratts v. Chater, 94 F.3d 35, 38–39 (2d Cir. 1996)).

IV. DISCUSSION

This Court affirms the Commissioner's finding that plaintiff is not disabled. The ALJ's determination, upon which the Commissioner's finding was made, was based upon the correct legal standard and supported by substantial evidence. Specifically, the ALJ's five-step disability analysis was consistent with legal standards and supported by substantial evidence in the record. (R. 17–18.) The ALJ's conclusion was well supported that plaintiff engaged in substantial gainful activity and/or has the "residual functional capacity to perform a full range of work at all exertional levels that is simple and repetitive, is low in stress, requires only one or two step commands, and involves just limited amounts of social contact . . . ." (Id.)

A. *Application of the Five-Step Test*

At step one, the ALJ determined that the plaintiff appears to have engaged in substantial gainful activity since May 30, 2008, and based this finding upon her posted earnings record maintained by the SSA. (R. 16–17.) The earnings reports show earnings of $12,006 in 2008 and $12,851 in 2009. (R. 74, 79, 81.) The ALJ correctly concluded that these amounts qualify as substantial gainful activity. See *Substantial Gainful Activity*, The Official Website of the U.S. Social Security Administration (last visited July 2, 2013), available at http://www.ssa.gov/oact/cola/sga.html (2008 and 2009 countable average monthly earnings, respectively, are $940 and $980).

Plaintiff's statements and testimony about her work activity are consistent with the ALJ's finding at step one that she was able to work. For example, plaintiff testified that she continued working as a childcare provider in 2010. (R. 25.) While plaintiff asserted that it was her husband who actually did the child care work, she testified that "if people brought the work home to me to do, I could do it." (R. 25, 27.) Moreover, in November 2008, plaintiff reported to

16

Dr. Fujiwaki that she had worked as a babysitter until October 2008, five months after her alleged onset date. (R. 144.) Also, in the October 2010 F.E.G.S. report, plaintiff reported that she had worked 40 hours a week caring for children, including cooking and serving the children food. (R. 129.) Thus, there is substantial evidence in the record to support the ALJ's conclusion that plaintiff engaged in substantial gainful activity during the relevant period and therefore was not entitled to the benefits.

Noting contradiction in plaintiff's testimony about her work activity, the ALJ, as an alternative to his step one finding, proceeded to make findings as to the remaining four steps of the sequential evaluation process. (See R. 17.) At the second step, the ALJ concluded that plaintiff does have a "severe" combination of major depressive disorder (mild to moderate in degree) and anxiety disorder, NOS. (R. 18.) However, at the third step, the ALJ reasonably concluded that these impairments were not so severe as to meet or medically equal the requisite criteria contained in the Listings. (R. 17–18.); see 20 C.F.R. Part 404, Subpart P, Appendix 1.

At the third step, the ALJ evaluated the evidence and assessed that plaintiff has "at least the residual functional capacity to perform a full range of work at all exertional levels that is simple and repetitive, is low in stress, requires only one-or-two step commands, and involves just limited amounts of social contact." (R. 17, 18.) There is no evidence or allegation that plaintiff had any physical impairments that restricted her ability to work. (See R. 23–39, 93.) At the time she applied for benefits, plaintiff affirmatively stated that she had "no pain" and consistent with that, she left blank the questions on the application form directed at physical impairments. (R. 112–14.) Indeed, the only physical examination in the record, performed by Dr. Yalla in May 2010, revealed entirely normal findings. (R. 140.) Therefore, the ALJ was correct in determining that plaintiff could perform work at all exertional levels.

Likewise, the medical evidence on record supports the ALJ's determination that plaintiff could perform a range of unskilled work. Dr. Caneva's eight mental status examinations from June 11, 2009 to February 8, 2010 showed plaintiff to be without psychomotor retardation, thought disorder, hallucinations, or delusions. (R. 169–70, 172, 174, 178, 190, 207, 217–18.) Plaintiff was always fully alert and oriented, her thought processes were always goal directed and linear, and her insight and judgment were always adequate or fair. (R. 169–70, 172, 174, 178, 190, 207, 218.) Plaintiff's social worker at WAC assessed plaintiff's GAF at 60, indicating that she had moderate symptoms or moderate difficulty in social, occupational, or school functioning. (R. 181, 211.)

While Dr. Caneva did opine on August 23 and September 20, 2010, after the relevant period, that plaintiff was "temporarily unemployable," the doctor declined to check an alternative box stating that plaintiff was "[u]nable to work for at least 12 months. ([M]ay be eligible for disability benefits)." (R. 233, 234.) Under the regulations, disability is defined as the "inability to do any substantial gainful activity by reason of medically determinable impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505, 416.905. In any event, the ALJ was not required to give any particular weight to this opinion. The regulations specify that the ultimate conclusion of whether an individual is "disabled" or "unable to work" is reserved to the Commissioner and conclusory opinions by others are entitled to no particular weight. 20 C.F.R. §§ 404.1527(e), 416.927(e).

After conducting a mental status examination, Dr. Fujiwaki opined that vocationally, plaintiff was able to follow and understand simple directions and instructions, perform simple tasks independently and make some simple decisions. (R. 146.) While plaintiff

18

had some difficulty maintaining attention and concentration, she was able to maintain a regular schedule. (Id.) She could learn new tasks with extended time and rest breaks, and could perform complex tasks with supervision and some difficulty. (Id.) Additionally, on November 17, 2008, Dr. Kudler concurred with Dr. Fujiwaki's assessment of plaintiff's ability to function in a work setting. (R. 164.)

Moreover, Dr. Vitolo testified that plaintiff was capable of performing low-stress, simple work that consisted of repetitive tasks, one or two step commands, and which involved limited social contact. (R. 34.) Thus, the medical and therapy evidence in the record is consistent with the ALJ's determination that plaintiff retained the residual functional capacity to perform a range of unskilled work.

In reaching his residual functional capacity finding, the ALJ found, for reasons that will be explained, that the plaintiff was not a credible witness. (R. 16.) It is well within the discretion of the Commissioner to evaluate the credibility of a claimant's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology. Mimms v. Heckler, 750 F.2d 180, 185–86 (2d Cir. 1984).

First, the ALJ found that plaintiff's testimony about her work history varied from her previous reports. (Id.) For instance, plaintiff first testified that she had worked taking care of two children in her home in 2008, 2009, and 2010. (R. 25.) She then testified that it was actually her husband who was doing the work, but she was claiming the earnings as her own because her husband was undocumented. (Id.) Additionally, plaintiff reported to Dr. Fujiwaki in November 2008 that she had last worked as a babysitter in October 2008. (R. 144.) Records from WAC dated October 2009 indicate that plaintiff reported she was a daycare worker. (R. 181.) Finally,

the October 2010 F.E.G.S. report indicates that she stated in May 2010 that she had been working full-time in childcare in March and April 2010. (R. 129.)

The ALJ also noted that plaintiff's testimony about the amount of work she performed in the past conflicted with her other reports about her work history. (R. 16.) Plaintiff testified that she only worked an hour-and-a-half a day as an ice-cream vendor and only worked washing hair for three or four months during a period six or seven years prior to the hearing. (R. 26.) However, plaintiff stated on a disability report filed in connection with her claim for benefits that she worked 60 hours per week as a hair washer from 2001 to 2003, and worked 40 hours per week as an ice cream vendor from 2004 to May 30, 2008. (R. 94; see also R. 116, 118.)

Also, the ALJ noted that plaintiff's testimony regarding her fears following the terrorist attacks on September 11, 2001 contradicted other information in the record. (R. 16.) Plaintiff testified that her fears after the events of that date caused her to be incapable of traveling by subway. (R. 27.) However, none of her mental health treatment records nor the F.E.G.S. evaluation mention phobic symptoms related to the attacks. (R. 16; see R. 122–43, 168–218.) Additionally, plaintiff told Dr. Fujiwaki in November 2008 that she was able to take public transportation alone and had traveled by train to the evaluation. (R. 144, 146.) Indeed, the October 2010 F.E.G.S. report indicates that plaintiff reported that she traveled independently by bus and train without limitations. (R. 133.) In light of the medical evidence, as well as the plaintiff's statements, the ALJ's residual functional capacity finding was reasonable and based on substantial evidence. Thus, the plaintiff would not have satisfied her burden on step three.

After determining at steps two and three that plaintiff's medically determinable impairments were not so severe as to medically equal the requisite criteria contained in the Listings, the ALJ proceeded to step four where he compared plaintiff's residual functional

20

capacity to the demands of her past relevant work. (R. 18.)  The ALJ found that the demands of

plaintiff's past relevant work (caring for children, selling ice cream, and/or washing hair)

exceeded her non-exertional limitations because those jobs seemed to be semi-skilled and

required significant social contact. (R. 17, 18.)  The ALJ found that plaintiff could not perform

her past relevant work at step four and proceeded to the fifth step in the sequential evaluation.

At the fifth step, the ALJ considered plaintiff's age, education, work experience

and her residual functional capacity to determine whether there was other work she could

perform. (R. 18.)  He first determined that plaintiff was a relatively young individual who

possessed more than a high school education and was able to communicate in English. (Id.)

Where the findings of fact made with respect to an individual's age, education, work experience

and residual functional capacity coincide with all the criteria of a rule, that rule directs a

conclusion as to whether an individual is or is not disabled. 20 C.F.R. §§ 404.1569, 416.969;

Heckler v. Campbell, 461 U.S. 458 (1983).  Here, the ALJ considered that plaintiff's residual

functional capacity was comprised of only non-exertional limitations and properly sought the

assistance of vocational expert testimony. (R. 18, 36–39.); see also *Titles II & XVI: Evaluation of*

*Chronic Mental Impairments*, SSR 83-15 (S.S.A 1983) (an additional vocational resource should

be relied on when a residual functional capacity is only for non-exertional limitations)).

The ALJ asked Ms. Vascardy, the vocational expert, to consider a hypothetical

person of plaintiff's age, education, language ability and prior work experience who was

restricted to performing simple, repetitive, low stress work that involved one or two steps and

limited social contact. (R. 37.)  Ms. Vascardy testified that such a person could perform work as

a hand packager, which was an unskilled job, performed at the medium exertional level (10,318

such jobs in the local economy, 162,882 nationally). (R. 38.)  Plaintiff could also work as a

21

cleaner, which was an unskilled job, performed at the medium exertional level (73,178 such jobs in the local economy, and 1,058,165 nationally). (Id.) Ms. Vascardy testified that plaintiff could also perform as an assembler of small products and a light packer, both unskilled, light work jobs (2,073 assembler of small products jobs locally, and 40,662 nationally; 19,948 light packer jobs locally, 314,905 nationally). (Id.) Thus, the ALJ reasonably determined that the Commissioner had satisfied his burden that there is other work in the national economy that plaintiff could perform.

V.  CONCLUSION

The ALJ properly applied the five-step sequential analysis to determine that plaintiff is not disabled and the decision was supported by substantial evidence in the record. Defendant's motion for judgment on the pleadings is granted and plaintiff's complaint is dismissed.  The decision of the Commissioner is affirmed.

Within 14 days, counsel for the Commissioner shall transmit to plaintiff all unpublished opinions cited herein.

This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and in forma pauperis status is denied. See Coppedge v. United States, 369 U.S. 438, 44–45 (1962).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
July 15 , 2013

22